IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROD BLAGOJEVICH, Governor of the State of Illinois, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 05-3190 |
| ROBERT M. GATES, Secretary of Defense of the United States; ANTHONY J. PRINCIPI, Chairman of the Defense Base Closure and Realignment Commission; JAMES H. BILBRAY; PHILLIP E. COYLE; HAROLD W. GEHMAN, JR.; JAMES V. HANSEN; JAMES T. HILL; LLOYD W. NEWTON; SAMUEL K. SKINNER; and SUE ELLEN TURNER, members of the Defense Base Closure and Realignment Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

    The Governor's motion for summary judgment is Denied.

    The Secretary of Defense's and the BRAC Commission's motion to dismiss is Allowed.

# I. BACKGROUND

This case concerns the 2005 Defense Base Closure and Realignment Commission's Report to the President and the Plaintiff's challenge to implementation of the recommendation that Capital Airport Air Guard Station be realigned and that the federally-owned F-16 fighter aircraft currently assigned to the Illinois Air National Guard's 183rd Fighter Wing at Capital Airport Air Guard Station be distributed to other locations. The Plaintiff is the Governor of Illinois. The Defendants include the Secretary of Defense of the United States and the Chairman and Members of the Defense Base Closure and Realignment Commission. The parties state that roughly half of the planes at issue are scheduled to be moved by no later than June 30, 2008, with the others to be moved no later than September 30, 2008.

On May 13, 2005, in a report to the Commission containing recommendations to realign or close military installations pursuant to the Base Closure and Realignment Commission process, the Secretary of Defense made the following recommendation regarding Capital Airport Air

Guard Station and the 183rd Fighter Wing:

> Realign Capital Airport Air Guard Station, IL. Distribute the 183d Fighter Wing's F-16s to the 122d Fighter Wing, Fort Wayne International Airport Air Guard Station, IN, (15 aircraft). Retire the 122d Fighter Wing's F-16s (15 aircraft). The wing's expeditionary combat support (ECS) elements, the Illinois ANG State Headquarters, and the 217th Engineering Installation Squadron remain in place. Realign Hulman Regional Airport Air Guard Station, IN. The 181st Fighter Wing's F-16s are distributed to the 122d Fighter Wing, Fort Wayne International Airport Air Guard Station, IN (nine aircraft), and retirement (six aircraft). The 181st Fighter Wing's ECS elements remain in place. Realign Dane County Regional Air Guard Station/Truax Field, WI, Joe Foss Field Air Guard Station, SD, Des Moines Air Guard Station, IA, Fort Wayne Air Guard Station, IN, and Lackland Air Force Base, TX, by relocating base-level F-110 intermediate maintenance to Capital, establishing a Centralized Intermediate Repair Facility (CIRF) at Capital for F-110 engines.

2005 Defense Base Closure and Realignment Commission Report to the President, Vol. I at 128, available at http://www.brac.gov/finalreport.asp.[1]

The Commission struck the Secretary's recommendation and replaced it (in relevant part) with the following:

> Realign Capital Airport Air Guard Station, IL. Distribute the 15

---

[1] <u>See also</u> Department of Defense Base Closure and Realignment Report, May 2005, Volume I, Part 2 of 2, p. Air Force-20, available at http://www.defenselink.mil/BRAC.

F-16 aircraft assigned to the 183d Fighter Wing, Capital Airport Air Guard Station, IL and the 15 F-16 aircraft assigned to the 122d Fighter Wing, Fort Wayne International Airport Air Guard Station, IN, to meet the Primary Aircraft Authorizations (PAA) requirements established by the Base Closure and Realignment recommendations of the Secretary of Defense, as amended by the Defense Base Closure and Realignment Commission.

Establish 18 PAA F-16 aircraft at the 122d Fighter Wing, Fort Wayne International Airport Air Guard Station, IN.

The Illinois ANG State Headquarters and the 217th Engineering Installation Squadron remain in place at Capital Airport Air Guard Station, IL.

If the State of Illinois decides to change the organization, composition and location of the 183d Fighter Wing to integrate the unit into the Future Total Force, all personnel allotted to the 183d Fighter Wing, including the wing Expeditionary Combat Support (ECS) elements, will remain in place and assume a mission relevant to the security interests of the State of Illinois and consistent with the integration of the unit into the Future Total Force, including but not limited to the Centralized Intermediate Repair Facility (CIRF) at Capital for F110 engines, air mobility, C4ISR, Information Operations, engineering, flight training or unmanned aerial vehicles. Where appropriate, unit personnel will be retrained in skills relevant to the emerging mission.

This recommendation does not effect a change to the authorized end-strength of the Illinois Air National Guard. The distribution of aircraft currently assigned to the 183d Fighter Wing is based upon a resource-constrained determination of the Department of Defense that the aircraft concerned will better

support national security requirements in other locations and is not conditioned upon the agreement of the state.

. . .

Realign Dane County Regional Air Guard Station/Truax Field, WI; Joe Foss Field Air Guard Station, SD; Des Moines Air Guard Station, IA; Fort Wayne Air Guard Station, IN; and Lackland Air Force Base, TX; by relocating base-level F-110 intermediate maintenance to Capital Air Guard Station, IL, establishing a Centralized Intermediate Repair Facility (CIRF) at Capital for F110 engines.

Id. at 129-30.

In arguing that the planes cannot be moved without his consent, the Governor relies primarily on two statutes. The first provides:

To secure a force the units of which when combined will form complete higher tactical units, the President may designate the units of the National Guard, by branch of the Army or organization of the Air Force, to be maintained in each State. . . .  However, no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor.

32 U.S.C. § 104(c).  The other statute provides, in pertinent part, that "[a] unit of . . . the Air National Guard of the United States may not be relocated or withdrawn under this chapter without the consent of the governor of the State."  10 U.S.C. § 18238.  The Governor contends the

5

decision to move certain aircraft assigned to the 183rd Fighter Wing of the Air National Guard from a base in Illinois to one in Indiana violates these statutes.

Congress enacted the Defense Base Closure and Realignment Commission Act of 1990, as amended ("BRAC Act" or "the Act"), and provided that it shall be the exclusive authority of the Secretary of Defense to close or realign military bases during the period covered by the Act.  See 10 U.S.C. § 2687.  The Governor alleges, moreover, that while Sections 2905(c) and 2905(e)(6) of the BRAC Act expressly supercede such other enactments as the National Environmental Policy Act of 1969 and the National Defense Policy Authorization Act of 1973, nothing in the Act purports to abrogate either section 104(c) or section 18238.  Because those statutes remain in force, the Governor contends that the F-16 fighter aircraft currently assigned to the Illinois Air National Guard's 183rd Fighter Wing cannot be moved without his consent.

The Court recently denied the Governor's motions for injunctive relief. The emergency motion for an injunction pending appeal was denied by the

United States Court of Appeals for the Seventh Circuit.

The Court now turns to the dispositive motions filed by the parties.

## II. ANALYSIS

It appears to the Court that Congress intended to preclude judicial review over the BRAC Act. Even if Congress did not so intend, however, the Court finds that the Governor's claims have no merit because the relevant statutes do not have a gubernatorial consent requirement in cases such as this.

### A. Judicial review of BRAC claims

Before addressing the merits, the Court will first consider whether Congress contemplated judicial review over BRAC actions. "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Block v. Community Nutrition Institute, 467 U.S. 340, 345 (1984). The Supreme Court has stated that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent

should the courts restrict access to judicial review." <u>Lindahl v. Office of Personnel Management</u>, 470 U.S. 768, 778 (1985) (citations omitted). "The congressional intent necessary to overcome the presumption [favoring judicial review] may also be inferred from contemporaneous judicial construction barring review and the congressional acquiescence in it." <u>Block</u>, 467 U.S. at 349 (citations omitted).

There does not appear to be any specific statutory language pertaining to whether judicial review under BRAC is contemplated. The Defendants contend that Congress's intent to preclude judicial review of the Secretary's implementation of BRAC recommendations is fairly discernible from the legislative history, the structure and purpose of the statutory scheme, and congressional acquiescence in Justice Souter's concurring opinion in <u>Dalton v. Specter</u>, 511 U.S. 462 (1994). The concurring opinion contains an extensive discussion of the legislative history, structure and purpose of the statutory scheme.

In <u>Dalton</u>, an action was brought under the Administrative Procedures Act seeking to enjoin the Secretary of Defense from closing a base pursuant

to BRAC. 511 U.S. at 464. The Court issued a narrow ruling, holding that "the actions of the Secretary and the Commission cannot be reviewed under the APA because they are not 'final agency actions.'" <u>Id.</u> at 476. Moreover, "[t]he actions of the President cannot be reviewed under the APA because the President is not an 'agency' under that Act." <u>Id.</u>

Justice Souter authored a concurring opinion in <u>Dalton</u> that was joined by three other justices. Justice Souter would have held that it is not necessary to decide whether the BRAC "report is final agency action, because the text, structure, and purpose of the Act compel the conclusion that judicial review of the Commission's [report] or the Secretary's compliance with it is precluded." <u>Id.</u> at 479. The concurring opinion notes that Congress was aware of "repeated, unsuccessful[] efforts to close military bases in a rational and timely manner." <u>Id.</u> Thus, Justice Souter observed that the Act's text and structure "plainly express congressional intent that action on a base-closing package be quick and final, or no action be taken at all." <u>Id.</u>

Justice Souter's concurring opinion goes on to cite several reasons why

Congress did not intend for judicial review, such as the "tight and rigid deadlines on administrative review and Presidential action." Id. at 479. The concurrence observed, "The Act requires that a decision about a base-closing package, once made, be implemented promptly." Id. at 480. Following the President's transmittal to Congress, moreover, the Secretary of Defense must commence the complicated base-closing process within two years and must complete it within six years. Id. Such deadlines would make little sense if judicial review of the implementation phase were allowed. See id. at 481.

Justice Souter further observed that the "linchpin of this unusual statutory scheme" is its "all-or-nothing feature," which tends to show that judicial review likely was not intended. Id. at 481. The President and Congress are required to accept or reject the recommendations as an entire package and may not "cherry pick." Id. The concurrence states, "This mandate for prompt acceptance or rejection of the entire package of base closings can only represent a considered allocation of authority between the Executive and Legislative Branches to enable each to reach important, but

politically difficult objectives." Id.  Justice Souter further stated:

> If judicial review could eliminate one base from a package, the political resolution embodied in that package would be destroyed; if such review could eliminate an entire package, or leave its validity in doubt when a succeeding one had to be devised, the political resolution necessary to agree on the succeeding package would be rendered the more difficult, if not impossible.  The very reasons that led Congress by this enactment to bind its hands from untying a package, once assembled, go far to persuade me that Congress did not mean the courts to have any such power through judicial review.

Id. at 481-82.

The concurrence goes on to note that, in addition to the strict timetables, the temporary nature of the Commission and requirement for timely implementation, and the all-or-nothing nature underlying the Act, two other features serve to bolster the conclusion that judicial review was not contemplated.  "First, the Act provides nonjudicial opportunities to assess any procedural (or other) irregularities." Id. at 482.  The Commission and the Comptroller General play a role in reviewing the Secretary's recommendations, as do the President and Congress.  See id.

Second, the Act expressly provides for judicial review, but only as to objections under the National Environmental Policy Act of 1969, 42 U.S.C.

§ 4321 et seq., "to implementation plans for a base closing, and only after the process of selecting a package of bases for closure is complete." Id. at 483. Justice Souter observed:

> This express provision for judicial review of certain NEPA claims within a narrow time frame supports the conclusion that the Act precludes judicial review of other matters, not simply because the Act fails to provide expressly for such review, but because Congress surely would have prescribed similar time limits to preserve its considered schedules if review of other claims had been intended.

Id. The concurrence concluded that several factors, namely the text, structure and purpose of the Act–including the narrow time frame and the all-or-nothing approach–in addition to the Act's provision for Executive and legislative review, and judicial review under NEPA, serve to overcome the presumption in favor of judicial review. See id. at 483-84.

Two district courts have found Justice Souter's opinion to be "persuasive," and have concluded that Congress intended to preclude judicial review of challenges to BRAC implementation. See Bredesen v. Rumsfeld, 500 F. Supp.2d 752, 760-61 (M.D. Tenn. 2007); see also Gregoire v. Rumsfeld, 463 F. Supp.2d 1209, 1221 (W.D. Wa. 2006)

("Justice Souter's concurring opinion is persuasive: the express language, structure, objectives, legislative history and the nature of the agency action compel the conclusion that Congress intended to preclude judicial review of actions taken pursuant to BRAC"). This Court also finds Justice Souter's concurrence in <u>Dalton</u> to be persuasive and agrees with the district courts which have held judicial review is precluded.

As the Defendants argue, it is also noteworthy that in the last fourteen years since <u>Dalton</u>, Congress has not expanded judicial review under the BRAC Act beyond the limited NEPA provision.

The Court finds that judicial review is precluded and this case must be dismissed for lack of jurisdiction. Pursuant to the Seventh Circuit's admonition, however, the Court will proceed to address the merits. <u>See</u> <u>Blagojevich v. Gates</u>, 519 F.3d 370, 373 (7th Cir. 2008) ("If the district court again perceives some new procedural obstacle, the court should address the merits as an additional ground of decision, so that the next appeal can bring this case to a conclusion").

B. Section 104(c)

Based on the text and structure of the statute, the Court finds that the second sentence in section 104(c), which alludes to the governor's approval, applies only when action is taken pursuant to the first sentence's authorization of certain presidential "designat[ions]." Because the realignment of the aircraft assigned to the 183rd Fighter Wing will be implemented under the BRAC Act, not as the result of a presidential designation "[t]o secure a force the units of which when combined will form complete higher tactical units," pursuant to section 104(c), the gubernatorial consent requirement is not triggered according to the plain language of the statute.

The Defendants note that section 104(c) is the combined product of the National Defense Act of 1916 and its 1933 amendments. In 1933, Congress amended section 60 to provide veto power to the State:

> [T]he President may prescribe the particular unit or units, as to branch or arm of service, to be maintained in each State, Territory, or the District of Columbia in order to secure a force which, when combined, shall form complete higher tactical units: <u>Provided</u>, that no change in allotment, branch, or arm of units or organizations wholly within a single State will be made without the approval of the governor of the State concerned.

14

Act of June 15, 1933, § 6, 48 Stat. 153, 156 (1933). The Court agrees with the Defendants that the structure of the amended law–specifically the use of the colon followed by the word "Provided"–shows that Congress was qualifying the authority it had conferred upon the President in 1916.[2] The Court concludes, therefore, that the statute's history supports the interpretation of the statute advanced by the Defendants.

Additionally, the Governor's interpretation of section 104(c) to include a gubernatorial consent requirement is inconsistent with the language of the BRAC Act, which specifically provided that the Secretary "shall . . . realign all military installations recommended for realignment by [the] Commission" and approved by the President (and not disapproved by Congress within the 45-day period). See Act § 2904. The Defendants note that because the realignment recommendation has been approved, the Secretary is obligated to implement the realignment. This is inconsistent with a gubernatorial consent requirement. Because the BRAC is more

---

[2] The Defendants note that the amendments since then have been stylistic or technical. See e.g., Pub. L. No. 84-1028 § 2, 70A Stat. at 598 (1956); Pub. L. No. 100-456 § 1234(b)(1)(1988).

15

recent and more specific, it would supersede and impliedly repeal section 104 to the extent that law could be interpreted to require the Governor's consent in this case.  See Brotherhood of Maintenance of Way Employees v. CSX Transp., Inc., 478 F.3d 814, 817 (7th Cir. 2007) (If two statutes deal with the same subject matter, "[a] specific statute takes precedence over a more general statute, and a later enacted statute may limit the scope of an earlier statute.").

The Court further agrees with the Defendants that a gubernatorial consent requirement would clearly conflict with the overall structure and purpose of the BRAC Act.  Given the Act's structure in delegating the decisions to a small group of federal actors subject to strict deadlines, it is apparent that one of its purposes was to attempt to take the local politics out of the decision-making process.  It makes little sense that state governors would be given authority that none of the federal officials authorized to act possess.  Congress clearly did not intend to authorize state governors to veto the closure or realignment of individual installations.  A purpose of the BRAC Act was to provide a "timely closure and realignment

of military installations inside the United States." See § 2901(b). A gubernatorial veto provision obviously is very much at odds with that goal.

Based on the foregoing, the Court concludes that any consent requirement in section 104 does not apply to the realignment of Capital Air Guard Station. A governor's approval is required only when action is taken pursuant to the first sentence's authorization of certain presidential "designat[ions]." See Gregoire v. Rumsfeld, 463 F. Supp.2d at 1224 ("In order to give effect to both the gubernatorial consent requirement in § 104, and the Secretary's obligations under BRAC, the language of [§ 104] should be interpreted . . . as the Secretary urges"). Section 104(c) does not apply to this case. Thus, the Court need not conclude that section 104 has been impliedly repealed by the BRAC Act.

C. Section 18238

The Governor also relies on section 18238 which provides that:

A unit of the Army National Guard of the United States or the Air National Guard of the United States may not be relocated or withdrawn under this chapter without the consent of the governor of the State or, in the case of the District of Columbia, the commanding general of the National Guard of the District of Columbia.

17

10 U.S.C. § 18238. The Governor contends that section 18238 prevents the Secretary from implementing the Commission's recommendation to realign Capital Air Guard Station without his consent. The Court concludes there are at least two reasons why section 18238 does not apply in this case.

By its express terms, section 18238 applies to relocations or withdrawals "under this chapter," which refers to chapter 1803 of title 10 (comprising sections 18231-18239). The BRAC Act is a distinct legal authority set forth in a note to 10 U.S.C. § 2687, which is part of chapter 159. Because the BRAC Act is not part of chapter 1803, therefore, section 18238 does not apply to actions taken under the Act.

The Court further concludes that section 18238 has no application because it applies to units which are "relocated or withdrawn." There is no recommendation to "relocate[] or withdraw" the 183rd itself. As the Defendants note, the Commission has recommended transferring only the aircraft.

Having carefully considered the text of section 18238, the Court concludes that the statute, like section 104(c) plainly does not apply to the

realignment at issue. Thus, the Court need not consider whether section 18238 has been repealed by the BRAC Act.

### III. CONCLUSION

The Court concludes that Congress intended to preclude judicial review over realignment challenges to the BRAC Act. Accordingly, the Court lacks jurisdiction to consider the Governor's challenge that his consent is required before the F-16 fighter aircraft currently assigned to the Illinois Air National Guard's 183rd Fighter Wing at Capital Airport Air Guard Station are moved. Even if the Court has jurisdiction, the Court concludes that the Governor is not entitled to any relief because gubernatorial consent, pursuant to 32 U.S.C. § 104(c) or 10 U.S.C. § 18238, is not required to the implementation of a realignment under the BRAC Act.

Ergo, this action is DISMISSED for lack of subject matter jurisdiction. Alternatively, the Defendants' motion to dismiss is ALLOWED. The Plaintiff's motion for summary judgment is DENIED.

CASE CLOSED.

ENTER: June 12, 2008

FOR THE COURT:

                                         s/Richard Mills
                                         United States District Judge